Slip Op. 20–45

## UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————— :
                                                :
BIO-LAB, INC., CLEARON CORP. and                :
OCCIDENTAL CHEMICAL CORP.,                       :
                                                :
          Plaintiffs,            :
                                                :          Before: Richard K. Eaton, Judge
        v.                     :
                                                :          Court No. 18-00155
UNITED STATES,                                   :
                                                :
          Defendant,             :
                                                :
          and                    :
                                                :
JUANCHENG KANGTAI CHEMICAL CO., LTD.:
and HEZE HUAYI CHEMICAL CO., LTD.,               :
                                                :
          Defendant-Intervenors. :
———————————————————————— :

## **OPINION**

[United States Department of Commerce's Final Results are sustained.]

Dated: April 7, 2020

    *James R. Cannon, Jr.*, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for Plaintiffs. With him on the brief was *Ulrika K. Swanson*.

    *Sonia M. Orfield*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were *Joseph H. Hunt*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of counsel on the brief was *Catherine Miller*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

    *Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, DC, argued for Defendant-Intervenors. With him on the brief were *J. Kevin Horgan* and *Alexandra H. Salzman*.

Eaton, Judge: Bio-Lab, Inc., Clearon Corp., and Occidental Chemical Corp. ("Plaintiffs")

are U.S. domestic producers of chlorinated isocyanurates[1] and the petitioners in this proceeding.

They challenge the United States Department of Commerce's ("Commerce" or the "Department")

final results published in *Chlorinated Isocyanurates From the People's Republic of China*, 83 Fed.

Reg. 26,954 (Dep't Commerce June 11, 2018) ("Final Results"), and the accompanying Issues and

Decision Mem. (June 5, 2018), P.R. 72 ("Final IDM").

In the Final Results, Commerce determined that Defendant-Intervenors and mandatory

respondents Juancheng Kangtai Chemical Co., Ltd. ("Kangtai") and Heze Huayi Chemical Co.,

Ltd. ("Heze"), Chinese producers and exporters of the chemicals, received countervailable

subsidies during the period of review, including through a loan program called the Export Buyer's

Credit Program.[2] *See* Final IDM at 1. It made this determination on the basis of adverse inferences,

having found that the use of adverse facts available ("AFA")[3] was warranted because the

---

[1]     Chlorinated isocyanurates, the subject chemicals, are "derivatives of cyanuric acid, described as chlorinated s-triazine triones" that are used for, among other things, water treatment. *See* Final IDM at 2; *Chlorinated Isocyanurates from the People's Rep. of China*, 79 Fed. Reg. 67,424 (Dep't Commerce Nov. 13, 2014) (countervailing duty order).

[2]     The Export Buyer's Credit Program provides credit at preferential rates to foreign purchasers of goods exported by Chinese companies in order to promote exports. *See Clearon Corp. v. United States*, 43 CIT __, 359 F. Supp. 3d 1344, 1347 (2019). The program has been the subject of much litigation before this Court. *See, e.g.*, *Yama Ribbons & Bows Co. v. United States*, No. 18-00054, 2019 WL 7373856, at *7 n.7 (CIT Dec. 30, 2019) (collecting cases).

[3]     Before Commerce may use AFA, it must make two separate findings. First, Commerce shall use facts available "[i]f . . . necessary information is not available on the record, or . . . an interested party or any other person . . . fails to provide . . . information [that has been requested by Commerce] . . . in the form and manner requested," or "significantly impedes" a proceeding. 19 U.S.C. § 1677e(a)(1)-(2)(B), (C). Second, if Commerce determines that the use of facts available is warranted, it must make the requisite additional finding that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" before it may use an adverse inference "in selecting from among the facts otherwise available." *Id.* § 1677e(b)(1).

Government of China (1) failed to provide necessary information about the operation of the Export

Buyer's Credit Program, and (2) failed to act to the best of its ability to cooperate with Commerce's

requests for information about the program.[4] *See* 19 U.S.C. § 1677e(a), (b); Final IDM at 5-6. To

determine an AFA rate for the Export Buyer's Credit Program, Commerce used a hierarchy it

developed for administrative reviews. *See* 19 U.S.C. § 1677e(d).[5] Applying step two of the

hierarchy, the Department selected the rate of 0.87 percent *ad valorem* as a component of the final

subsidy rate calculated for Kangtai and Heze. *See* Final IDM at 12. This rate had previously been

determined in an earlier segment of the same proceeding for a Chinese government loan program

called the Export Seller's Credit Program. Commerce found the Export Seller's Credit Program to

be "similar" to the Export Buyer's Credit Program because each conferred a similar benefit: access

to government-subsidized loans. *See* Final IDM at 12; 19 U.S.C. § 1677e(d)(1)(A)(i) (emphasis

added) (permitting Commerce to "use a countervailable subsidy rate applied for the same or

*similar program* in a countervailing duty proceeding involving the same country").

    Quite naturally, Plaintiffs do not question Commerce's finding that the use of AFA was

warranted. Nor do Plaintiffs dispute the lawfulness of the hierarchy that Commerce used to select

an AFA rate for the Export Buyer's Credit Program. Rather, they argue that the hierarchy, as

---

[4]    It is worth noting that, while the Department found that the respondents benefitted from the Export Buyer's Credit Program, based on AFA, the only evidence on the record regarding use is that the respondents' U.S. customers did not use the program. *See* Kangtai's Sec. III Quest. Resp. (Apr. 12, 2017), Ex. 15, C.R. 15; Heze's Sec. III Quest. Resp. (Apr. 12, 2017), Ex. 12, C.R. 7.

[5]    In pertinent part, this subsection provides that if Commerce "uses an inference that is adverse to the interests of a party under [19 U.S.C. § 1677e(b)(1)(A)] in selecting among the facts otherwise available," Commerce "may . . . in the case of a countervailing duty proceeding . . . (i) use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country; or (ii) if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that [Commerce] considers reasonable to use." 19 U.S.C. § 1677e(d)(1).

applied here, resulted in a rate for the program that is "simply too low to induce" the Government of China to cooperate with Commerce's requests for information in the future. *See* Pls.' Reply Br. Supp. Mot. J. Admin. R., ECF No. 37, 6; Pls.' Mem. Supp. Mot. J. Admin. R., ECF No. 26-1 ("Pls.' Br.") 3. Thus, for Plaintiffs, the rate fails to satisfy the purpose of the AFA statute and, therefore, is contrary to law. *See* Pls.' Br. 3; 19 U.S.C. § 1677e(b). In addition, Plaintiffs claim that substantial record evidence does not support the finding that the Export Buyer's Credit Program and the Export Seller's Credit Program are "similar." *See* Pls.' Br. 3. As a result, they ask the court to "remand [this case] to [Commerce] with instructions to reconsider [these] issues and address specifically the rationale for relying on a 0.87 percent subsidy rate rather than a higher rate and the reasons for finding that Export Buyer's Credits and Export Seller's Credits are 'similar' for purpose of applying adverse inferences pursuant to the statute." Pls.' Br. 20.

For their part, Defendant the United States ("Defendant"), on behalf of Commerce, and Defendant-Intervenors Kangtai and Heze ask the court to sustain the Final Results. *See* Def.'s Resp. Pls.' Mot. J. Agency R., ECF No. 34 ("Def.'s Br."); *see also* Def.-Ints.' Resp., ECF No. 33.

Jurisdiction is found under 28 U.S.C. § 1581(c) (2012). Because Commerce's selection of 0.87 percent as the AFA rate for the Export Buyer's Credit Program is supported by substantial evidence and otherwise in accordance with law, the Final Results are sustained.

## BACKGROUND

### I.     The Administrative Review

In January 2017, at the request of Plaintiffs and Defendant-Intervenors, the Department commenced the second administrative review of the countervailing duty order on chlorinated isocyanurates from China. *See Initiation of Antidumping and Countervailing Duty Admin.*

*Reviews*, 82 Fed. Reg. 4294 (Dep't Commerce Jan. 13, 2017); *see also Chlorinated Isocyanurates From the People's Rep. of China*, 79 Fed. Reg. 67,424 (Dep't Commerce Nov. 13, 2014) (countervailing duty order). The period of review was January 1, 2015, through December 31, 2015. *See* Final IDM at 1. Three Chinese producers and exporters of the subject chemicals were selected as mandatory respondents, including Kangtai and Heze.[6]

Between February and September 2017, Commerce sent questionnaires to the Government of China, as well as to Kangtai and Heze. The Department asked the Government of China to provide information about, among other things, the operation of the Export Buyer's Credit Program—a government loan program administered by the state-owned China Export Import Bank. From Kangtai and Heze, the Department sought information about their U.S. customers' use of the program during the period of review. *See* Countervailing Duty Quest. (Feb. 27, 2017), P.R. 11.

Between April and October 2017, Commerce received timely responses to its questionnaires. Kangtai and Heze provided the information that Commerce asked for, including evidence that their U.S. customers did not obtain financing through the Export Buyer's Credit Program. *See* Kangtai's Sec. III Quest. Resp. (Apr. 12, 2017), Ex. 15, C.R. 15; Heze's Sec. III Quest. Resp. (Apr. 12, 2017), Ex. 12, C.R. 7. The Government of China, however, did not. Specifically, the Government of China responded that some of the information that the Department sought about the operation of the Export Buyer's Credit Program was "not applicable," because the mandatory respondents' U.S. customers did not use the program. *See* China's Initial CVD Quest. Resp. (Apr. 12, 2017), P.R. 21-24. In addition, China asserted that it was "unable" to provide the requested information, not because it did not have it, but because, in its view, the

---

[6]       The third company, Hebei Jiheng Chemical Co. Ltd., is not a party to this action.

information was "not necessary" to Commerce's determination. *See* China's Second Suppl. CVD

Quest. Resp. (Oct. 2, 2017), P.R. 45.


## II.      Preliminary Results

On December 4, 2017, the preliminary results of the administrative review were published.

*See Chlorinated Isocyanurates From the People's Rep. of China*, 82 Fed. Reg. 57,209 (Dep't

Commerce Dec. 4, 2017) ("Preliminary Results"), and accompanying Preliminary Decision Mem.

(Nov. 27, 2017), P.R. 49 ("Prelim. Dec. Mem."). Commerce preliminarily determined that the

Government of China failed to cooperate with its requests for information. In particular,

Commerce found that China's questionnaire responses failed to provide necessary information

regarding, *inter alia*: (1) whether the China Export Import Bank uses third-party banks to disburse

or settle Export Buyer's Credits, (2) the interest rates it used during the period of review, and

(3) whether, after the program was amended in 2013, the China Export Import Bank limited the

provision of Export Buyer's Credits to business contracts exceeding \$2 million. *See* Prelim. Dec.

Mem. at 12. Finding that it could not fully analyze the operation of the program without this

information, the Department concluded that necessary information was missing from the record,

and that the use of facts available was warranted. *See* 19 U.S.C. § 1677e(a).

Commerce also found that the Government of China had failed to act to the best of its

ability to cooperate with its information requests, and used the adverse inference that, during the

period of review, Kangtai and Heze received a countervailable benefit under the Export Buyer's

Credit Program. *See* Prelim. Dec. Mem. at 12; 19 U.S.C. § 1677e(b).

Having found that Kangtai and Heze used and benefitted[7] from the Export Buyer's Credit Program, Commerce determined an AFA rate for the program using a hierarchical approach. *See* 19 U.S.C. § 1677e(d); Final IDM at 5. The selected rate—0.87 percent—was included in Commerce's calculation of preliminary individual countervailable subsidy rates for Kangtai and Heze. *See* Preliminary Results, 82 Fed. Reg. at 57,210.

### III.    Final Results

On June 5, 2018, Commerce issued its Final IDM and found, as it had in the Preliminary Results, that Kangtai and Heze received countervailable subsidies at 0.87 percent *ad valorem* under the Export Buyer's Credit Program.[8] *See* Final IDM at 11 ("As AFA, we determine that [the Export Buyer's Credit Program] provides a financial contribution, is specific, and provides a benefit to the company respondents within the meaning of [the statute]."). Kangtai's and Heze's final net subsidy rates, inclusive of the 0.87 percent rate, were 1.53 percent and 2.84 percent, respectively. *See* Final Results, 83 Fed. Reg. at 26,954. Dissatisfied with these final rates as too low to induce the Government of China to cooperate with Commerce's requests for information, and questioning whether the Export Buyer's Credit Program and the Export Seller's Program were "similar," Plaintiffs commenced this action.

---

[7]     Under Commerce's regulations "[i]n the case of a loan, a benefit exists to the extent that the amount a firm pays on the government-provided loan is less than the amount the firm would pay on a comparable commercial loan(s) that the firm could actually obtain on the market. 19 C.F.R. § 351.505(a)(1) (2017).

[8]     Commerce calculates "an *ad valorem* subsidy rate by dividing the amount of the benefit allocated to the period of investigation . . . by the sales value during the same period of the product or products to which [it] attributes the subsidy . . ." 19 C.F.R. § 351.525(a).

## STANDARD OF REVIEW

The court will sustain a determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).


## LEGAL FRAMEWORK

### I.   Commerce's Authority to Impose Countervailing Duties

If Commerce determines that a foreign government or public entity "is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States," a duty will be imposed in an amount equal to the net countervailable subsidy. 19 U.S.C. § 1671(a). This "remedial measure . . . provides relief to domestic manufacturers by imposing duties upon imports of comparable foreign products that have the benefit of a subsidy from the foreign government." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014) (citation omitted). The countervailing duty statute applies equally when the imported merchandise is from a nonmarket economy country.[9] *See* 19 U.S.C. § 1671(f)(1); *see also TMK IPSCO v. United States*, 41 CIT __, __, 222 F. Supp. 3d 1306, 1313 (2017).

In its countervailability determinations, Commerce must assess the nature of a foreign government's alleged financial contribution. *See* 19 U.S.C. § 1677(5). Thus, "Commerce often requires information from the foreign government allegedly providing the subsidy." *Fine*

---

[9]   A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). China is a nonmarket economy country. *See* Prelim. Dec. Mem. 3.

*Furniture*, 748 F.3d at 1369-70. This is because "normally, [foreign] governments are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients." *Id.* at 1370 (citation omitted). "Additionally, Commerce sometimes requires information from a foreign government to determine whether a particular respondent received a benefit from an alleged subsidy." *Id.*

## II.    Commerce's Authority to Use Adverse Inferences

Because Commerce lacks the power to subpoena documents and information, the law authorizes it to use an adverse inference to induce cooperation with its requests for information. *See* 19 U.S.C. § 1677e; *see also BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1295 (Fed. Cir. 2019) (quoting *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337, 1338 (Fed. Cir. 2016)) ("During an administrative review, the 'burden of creating an adequate record lies with interested parties and not with Commerce. . . . This is because 'the International Trade Administration, the relevant agency within Commerce, has no subpoena power.'").

If adequate information is not forthcoming, Commerce may, under the right circumstances, apply an adverse inference. First, there must be a gap in the factual record. *See* 19 U.S.C. § 1677e(a). Thus, if a party to a proceeding fails to provide, in a timely fashion, information that Commerce has asked for, then "Commerce shall fill in the gaps with 'facts otherwise available.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1677e(a)).

Second, there must be a finding that an interested party has failed to cooperate to "the best of its ability" with Commerce's request for information. *See* 19 U.S.C. § 1677e(b). "[I]f Commerce determines that an interested party has 'failed to cooperate by not acting to the best of its ability to

comply' with a request for information, it may use an adverse inference in selecting a rate from

these facts," pursuant to 19 U.S.C. § 1677e(b).[10] *BMW*, 926 F.3d at 1295 (quoting *Nippon Steel*,

337 F.3d at 1381).

The purpose of AFA is to provide respondents with an incentive to cooperate in

Commerce's investigations and reviews. *See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v.

United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("*De Cecco*"). While Commerce may use

adverse inferences to encourage future cooperation, it may not use AFA to punish respondents. *Id.*

(citation omitted) ("[T]he purpose of section 1677e(b) is to provide respondents with an incentive

to cooperate, not to impose punitive, aberrational, or uncorroborated margins.").

A foreign government may be found to be an uncooperative party. Thus, AFA may be used

to induce, or encourage, a foreign government's cooperation. *See Fine Furniture*, 748 F.3d at 1371

("[O]n its face, the statute authorizes Commerce to apply adverse inferences when an interested

party, including a foreign government, fails to provide requested information."). That is, where a

foreign government is uncooperative, respondent companies from that country may receive an

AFA rate, even if they themselves are cooperative. The rationale for permitting the application of

AFA to cooperative respondents is that "a remedy that collaterally reaches [a cooperative

respondent] has the potential to encourage the [foreign government] to cooperate so as not to hurt

its overall industry." *Id.* at 1373. Though Commerce's use of adverse inferences may adversely

impact a cooperating party, Commerce must take into consideration the respondent's status as a

cooperating party when determining an AFA rate. Indeed, the cases indicate that, where a

nonmarket economy respondent is cooperative but the government of its country is not, the court

---

[10]     When using adverse inferences, Commerce may rely upon information derived
from the petition, a final determination, any previous review or determination, or any other
information placed on the record. *See* 19 U.S.C. § 1677e(b)(2)(A)-(D).

should lean toward accuracy and away from deterrence. *See Changzhou Trina Solar Energy Co. v. United States*, No. 17-00246, 2018 WL 6271653 (CIT Nov. 30, 2018) ("*Changzhou I*") (citing *Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States*, 753 F.3d 1227, 1234 (Fed. Cir. 2014)).

**III.     Commerce's Use of a Hierarchy to Determine an AFA Countervailable Subsidy Rate**

The adverse inferences statute, § 1677e, was amended in 2015 by the Trade Preferences Extension Act to add subsection (d). *See* Trade Preferences Extension Act of 2015 § 502, Pub. L. No. 114-27, 129 Stat. 362 (June 29, 2015), codified in 19 U.S.C. § 1677e(d) (Supp. III 2015). Subsection (d) addresses subsidy rates in AFA determinations. In pertinent part, this subsection provides that if Commerce "uses an inference that is adverse to the interests of a party under [19 U.S.C. § 1677e(b)(1)(A)] in selecting among the facts otherwise available," it "may . . . in the case of a countervailing duty proceeding":

> (i) use a countervailable subsidy rate applied for the *same or similar program* in a countervailing duty proceeding involving the same country; or
>
> (ii) if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that [Commerce] considers reasonable to use.

19 U.S.C. § 1677e(d)(1)(A) (emphasis added). For administrative reviews, Commerce has employed a four-step hierarchical method in an effort to satisfy the statute's "same or similar program" injunction:

> The AFA hierarchy for reviews has four steps, applied in sequential order. The first step is to apply the highest non-*de minimis* rate calculated for a cooperating respondent for the identical program in any segment of the same proceeding. If there is no identical program match within the proceeding, or if the rate is *de minimis*, the second step is to apply the highest non-*de minimis* rate calculated for a cooperating company for a similar program within any segment of the same proceeding. If there is no non-*de minimis* rate calculated for a similar program within [the] same proceeding, the third step is to apply the highest non-*de minimis*

rate calculated for an identical or similar program in another countervailing duty proceeding involving the same country. If no such rate exists under the first through third steps, the fourth step is to apply the highest rate calculated for a cooperating company for any program from the same country that the industry subject to the investigation could have used.

Final IDM at 5.

This Court has reviewed with approval Commerce's use of hierarchical methods to determine AFA subsidy rates.[11] *See, e.g.*, *Essar Steel Ltd. v. United States*, 37 CIT __, __, 908 F. Supp. 2d 1306, 1312-13 (2013), *aff'd* 753 F.3d 1368 (Fed. Cir. 2014); *SolarWorld Americas, Inc. v. United States*, 41 CIT __, __, 229 F. Supp. 3d 1362, 1370 (2017) (upholding reasonableness of the hierarchy, stating "Commerce is entitled to devise a methodology to apply to all cases and the court cannot say that this methodology is unreasonable in general or as applied here."); *see also Essar Steel Ltd. v. United States*, 753 F.3d 1368, 1373-74 (Fed. Cir. 2014).

## DISCUSSION

I. **Commerce Did Not Err by Using the Hierarchy to Determine an AFA Rate for the Export Buyer's Credit Program**

In the Final Results, Commerce determined that using facts available was warranted when determining a subsidy rate for the Export Buyer's Credit Program because the Government of China failed to provide requested information about the operation of the program, and thus, necessary information was missing from the record. *See* Final IDM at 5; 19 U.S.C. § 1677e(a). Additionally, Commerce used an adverse inference because, it found, the Government of China

---

[11]     Commerce employs a different four-step hierarchy method to determine AFA rates in countervailing duty *investigations*, which this Court has reviewed with approval. *See SolarWorld Americas, Inc. v. United States*, 41 CIT __, __, 229 F. Supp. 3d 1362, 1370 (2017).

had not "cooperate[d] to the best of its ability" to comply with the Department's requests for

information. *See* Final IDM at 5; 19 U.S.C. § 1677e(b).

Having determined the use of AFA was warranted, Commerce then applied its hierarchy

to select an AFA rate:

> Because we have not calculated a rate for an identical program in this proceeding,
> we then determine, under step two of the hierarchy, if there is a calculated rate for
> a similar/comparable program (based on the treatment of the benefit) in the same
> proceeding, excluding *de minimis* rates. In the instant review, the [Government of
> China] reported that the Export Buyer's Credit Program provides loan support
> through export buyer's credits. Based on the description of the Export Buyer's
> Credit Program as provided by the [Government of China], we continue to find that
> [the] Export Seller's Credit Program and the Export Buyer's Credit Program are
> similar/comparable programs as both programs provide access to loans. When
> Commerce selects a similar program, it looks for a program with the same type of
> benefit. For example, it selects a loan program to establish the rate for another loan
> program, or it selects a grant program to establish the rate for another grant
> program. Consistent with this practice, upon examination of the available above *de
> minimis* programs from the current review and the underlying investigation,
> Commerce selected the Export Seller's Credit Program because it confers the *same
> type of benefit* as the Export Buyer's Credit Program, as both programs are
> subsidized loans from the China [Export Import] Bank.

Final IDM at 12-13 (emphasis added). Thus, Commerce applied "the 0.87 percent *ad valorem*

countervailable subsidy rate for the Export Seller's Credit Program," which had been previously

determined in an earlier segment of the proceeding, as the AFA rate for the Export Buyer's Credit

Program. Final IDM at 13. Commerce has used this approach in other cases. *See, e.g.*, *Clearon

Corp. v. United States*, 43 CIT __, 359 F. Supp. 3d 1344, 1362 (2019)[12] (sustaining Commerce's

selection of the 0.87 percent rate assigned to the Export Seller's Credit Program during the

---

[12]       Plaintiffs here are also the plaintiffs in *Clearon*, where the Court remanded
Commerce's final results of the first administrative review of the subject countervailing duty order.
As Plaintiffs acknowledge in their opening brief, the issues and arguments in the two cases overlap.
*See* Pls.' Br. 1 n.1. Relevant to this case, the *Clearon* Court sustained the 0.87 percent AFA rate
as supported by substantial evidence based on the record there, and in doing so, rejected many of
the same arguments Plaintiffs make here. *Clearon*, 43 CIT at __, 359 F. Supp. 3d at 1360
(sustaining in part and remanding on grounds not relevant to this case).

investigation); *Changzhou I*, 2018 WL 6271653, *5 (sustaining Commerce's use of a sufficiently

similar program from an earlier administrative review).

Kangtai's and Heze's final net subsidy rates, inclusive of the 0.87 percent rate, were 1.53

percent and 2.84 percent, respectively. *See* Final Results, 83 Fed. Reg. at 26,954. Specifically,

Kangtai's 1.53 percent final net subsidy rate reflects the sum of two countervailable programs:

(1) 0.87 percent *ad valorem* for the Export Buyer's Credit Program; and (2) 0.66 percent *ad

valorem* for electricity provided at less than adequate remuneration. *See* Final IDM at 6. Heze's

2.84 percent final net subsidy rate reflects the sum of three countervailable programs: (1) 0.87

percent *ad valorem* for the Export Buyer's Credit Program; (2) 1.22 percent *ad valorem* for

electricity provided at less than adequate remuneration; and (3) 0.75 percent *ad valorem* for self-

reported grants. *See* Final IDM at 6.

The domestic producer Plaintiffs' main argument is that Commerce's "rigid application"

of its hierarchy, which resulted in the selection of the 0.87 percent rate, "was arbitrary and not in

accordance with law because it defeated the purpose of the statute":

> The purpose of the statute is to apply an "adverse" inference in order to deter
> responding foreign producers and companies from withholding information or
> failing to cooperate in Commerce proceedings. Here, Commerce applied a net
> subsidy rate of only 0.87 percent to the Export Buyer's Credit Program, despite that
> Commerce had applied a rate of 10.54 percent to that program in prior cases and
> despite that a 0.87 percent rate was manifestly inadequate to deter China from
> refusing to supply needed information.

Pls.' Br. 3. In other words, for Plaintiffs, if the 10.54 percent rate, that was selected for the program

in a different proceeding, failed to deter non-cooperation by the Government of China, a 0.87

percent rate was sure to fail in this proceeding. Although they do not argue for a specific rate,

apparently Plaintiffs seek a rate in excess of 10.54 percent since they note that that rate was not

sufficient to induce the Government of China to cooperate. *See* Pls.' Br. 13.

Plaintiffs acknowledge that "[i]nducement is not the only purpose of the statute," and that Commerce must balance the dual objectives of inducement and accuracy. Pls.' Br. 12. They insist, however, that here, Commerce has ignored the deterrence objective. *See* Pls.' Br. 12 ("Commerce must at least consider whether a particular AFA rate will be effective in encouraging cooperation.").

In response, Commerce urges the court to reject Plaintiffs' argument that it should have departed from its hierarchy:

> In the instant review, Commerce properly applied its review hierarchy in selecting an AFA rate. Making identical arguments as the plaintiffs in *Clearon Corp.*, Bio-Lab contends that the rate selected is not sufficiently adverse to "provide any meaningful incentive to the Government of China." . . . However, "neither the statute nor the regulations dictate how Commerce is to determine the AFA rate." . . . Thus, Commerce has "great" discretion when applying an AFA margin. . . . Here, the rate selected is not *de minimis*, and given that the program at issue was found to have not been used in a prior segment, the selected rate is adverse in terms of meeting the goals described above for selecting a rate in a review.

Def.'s Br. 11 (citations omitted). For the Department, "selecting a different rate from another proceeding in this segment would be a change in practice . . ., which would upset the balance between relevancy [*i.e.*, accuracy] and inducement that Commerce seeks to achieve when it applies its [countervailing duty] AFA hierarchy to non-cooperating respondents." Final IDM at 13. Thus, Commerce maintains that application of the hierarchy was in accordance with law, based on record evidence, and fair because it recognized that the Defendant-Intervenors Kangtai and Heze had cooperated in the review.

The court finds that Commerce did not err by using its hierarchy to determine an AFA rate for the Export Buyer's Credit Program in the Final Results. In *Changzhou I*, this Court rejected arguments similar to those raised by Plaintiffs, on a similar factual record. *Changzhou I* is instructive.

At issue in *Changzhou I* were the final results of an administrative review of a countervailing duty order on solar products. There, as here, Commerce found that the Government of China had failed to cooperate to the best of its ability to provide necessary information about the Export Buyer's Credit Program. As a result, Commerce found that the use of AFA was warranted. *See* 19 U.S.C. § 1677e(a), (b). It further found, based on AFA, that the cooperating Chinese respondents had received a benefit under the program, notwithstanding their claims to the contrary. Commerce, thus, applied its hierarchy and, under step two, selected an AFA rate for the program of 0.58 percent—the rate that had been previously determined for another loan program (the "Preferential Loans and Directed Credit" program) in the same proceeding. *Changzhou I*, 2018 WL 6271653, *4.

SolarWorld Americas, Inc., the U.S. petitioner, argued that while Commerce was correct to find AFA warranted, its application of the hierarchy to determine the AFA rate for the program was not in accordance with law because the resulting rate—0.58 percent—was too low to achieve the statutory goal of deterrence:

> [I]n using its established [hierarchy] methodology, Commerce arrived at an AFA rate too low to induce compliance in future proceedings. . . . SolarWorld argues that 19 U.S.C. § 1677e requires Commerce to set a rate high enough to encourage a party's future compliance in administrative reviews. . . . SolarWorld details several proceedings in which a higher rate has failed to result in the [Government of China's] future full compliance with Commerce's reviews. . . . Based on this history of [Government of China] noncompliance, SolarWorld argues that such a low rate of 0.58 percent will not encourage compliance.

*Id.* (internal citations omitted). The *Changzhou I* Court rejected this argument. Central to its reasoning was that the company that would receive the adverse rate was a cooperating respondent:

> As the United States Court of Appeals for the Federal Circuit has stated "the purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." . . . What SolarWorld essentially argues is for Commerce to deviate from an established

practice because the rate assessed was not high enough to be punitive. This argument fails. . . .

[E]ven if Commerce, on remand, finds that the [Government of China] refused to comply with Commerce's requests such that a resort to AFA is warranted, SolarWorld fails to appreciate that [mandatory respondent] Trina is a cooperating respondent. When selecting a rate for a cooperating party, "the equities would suggest greater emphasis on accuracy" over deterrence.

*Id.* at *4-5 (first quoting *De Cecco*, 216 F.3d at 1032; then quoting *Mueller*, 753 F.3d at 1234).

The *Changzhou I* Court relied on principles that are well-established in this Court and the

Federal Circuit, including that determining a rate that is relevant, *i.e.*, accurate, is a primary

statutory objective:

[A]lthough encouraging compliance is a valid consideration in determining an AFA rate, it is not, as SolarWorld argues "inconsistent with the statute" for Commerce to weigh other factors, such as relevancy, which ultimately result in a presumably low AFA rate. . . . As the court in *Mueller* stated, "the primary objective [is] the calculation of an accurate rate."

*Id.* at 5 (quoting *Mueller*, 753 F.3d at 1235); *see also SolarWorld*, 41 CIT at __, 229 F. Supp. 3d

at 1366 (citing *De Cecco*, 216 F.3d at 1032) ("An AFA rate selected by Commerce must reasonably

balance the objectives of inducing compliance and determining an accurate rate."). The Federal

Circuit's opinion in *Mueller*, cited in *Changzhou I*, outlined principles that are applicable here:

This Court's decision in [*De Cecco*, 216 F.3d at 1032], required that, even for a non-cooperating party, subsection [1677e](b) be applied to arrive at "a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance." *All the more so for a cooperating party, for which the equities would suggest greater emphasis on accuracy in the overall mix*. Moreover, this Court's decision in *Changzhou* made clear that, *in the case of a cooperating party, Commerce cannot confine itself to a deterrence rationale and also must carry out a case-specific analysis of the applicability of deterrence and similar policies. Changzhou Wujin Fine Chemical Factory Co., Ltd. v. U.S.*, 701 F.3d 1367, 1379 (Fed. Cir. 2012). And those principles were in no way questioned in [*Fine Furniture*, 748 F.3d at 1370-71], which simply rejected a contention that a countervailing duty rate for a cooperating importer could not be based on adverse inferences drawn against a non-cooperating foreign country (about the country's subsidizing of an input into the importer's product).

*Mueller*, 753 F.3d at 1234 (emphasis added); *see also Changzhou Wujin*, 701 F.3d at 1378

(questioning the relevance of deterrence "where the 'AFA rate' only impacts cooperating

respondents" and noting that "applying an adverse rate to cooperating respondents undercuts [with

respect to respondents] the cooperation-promoting goal of the AFA statute").

Finally, the *Changzhou I* Court found that the hierarchy was a reasonable way to effect the

AFA statute. *See Changzhou I*, 2018 WL 6271653, at \*5; *see also* 19 U.S.C. § 1677e(d). The Court

observed that departing from the hierarchy because the resulting rate was perceived as "too low"

could itself be viewed as arbitrary:

> [I]nsisting that Commerce deviate from this established practice because the rate is
> not seen to be a sufficient deterrent or perhaps, in this circumstance, not sufficiently
> punitive strikes the court as arbitrary. Commerce's hierarchy establishes both some
> consistency and predictability in Commerce's determinations and also attempts to
> guard against setting too low a rate by requiring the selected program to have a non-
> *de minimis* rate. In this specific instance, Commerce applied the *highest* non-*de
> minimis* rate for a similar program, further supporting its contention that Commerce
> attempted to strike a balance between relevancy and inducement.

*Changzhou I*, 2018 WL 6271653, at \*5. Ultimately, the Court "sustain[ed] Commerce's use of its

established hierarchy in assessing" the 0.58 percent rate for the Export Buyer's Credit Program in

that case. *Id.*

As in *Changzhou I*, Plaintiffs would elevate deterrence over accuracy and fairness even

though Kangtai and Heze were cooperating respondents. The cases, however, indicate that the

respondents' status as cooperating respondents must be taken into account when determining an

AFA rate. *See Clearon*, 43 CIT at __, 359 F. Supp. 3d at 1362 ("[W]hether a rate is sufficient to

encourage cooperation in the future is based on Commerce's consideration of the facts."). *Clearon*

was a case that involved the same plaintiffs and a similar factual record. There too, Commerce

used the 0.87 percent rate for the Export Buyer's Credit Program. The plaintiffs argued there, as

they do here, that if a 10.54 percent adverse subsidy rate, which was sustained by this Court in a

separate case, had failed to deter non-cooperation by the Government of China, a 0.87 percent rate, likewise, would probably fail to encourage compliance. The Court rejected the argument that 0.87 percent was "unreasonably low to deter future non-cooperation," and considered the rate's impact on the accuracy of each cooperating respondent's final net subsidy rate. *Id.*, 43 CIT at __, 359 F. Supp. 3d at 1361. For example, noting that Heze's final net subsidy rate, inclusive of the 0.87 percent rate for the Export Buyer's Credit Program, was 1.91 percent, the *Clearon* Court observed that "even if the 0.87 percent rate might appear low in comparison to the 10.54 percent rate, its inclusion in the calculation of Heze's rate increased its rate by approximately 100 percent to 1.91 percent." *Id.*, 43 CIT at __, 359 F. Supp. 3d at 1362.

Although the final net subsidy rates at issue in *Clearon* and those at issue here are different, the same reasoning applies—placing greater emphasis on accuracy over deterrence is not unreasonable when dealing with cooperating respondents. *See Changzhou I*, 2018 WL 6271653, at *5 (quoting *Mueller*, 753 F.3d at 1234) ("When selecting a rate for a *cooperating* party, 'the equities would suggest greater emphasis on accuracy' over deterrence."). Here, Kangtai's and Heze's final net subsidy rates, inclusive of the 0.87 percent rate, were 1.53 percent for Kangtai and 2.84 percent for Heze. *See* Final Results, 83 Fed. Reg. at 26,954. Thus, the 0.87 percent AFA rate for the Export Buyer's Credit Program constitutes more than one-half of Kangtai's 1.53 percent rate, and approximately one-third of Heze's 2.84 percent rate. These rates reasonably emphasize accuracy over deterrence without undercutting the cooperation-promoting goal of the AFA statute. *See Changzhou Wujin*, 701 F.3d at 1378. Moreover, if Plaintiffs' argument that a rate of 10.54 percent was too low to result in cooperation were taken seriously, a rate even higher and farther away from an accurately calculated rate would be required. In any event, Plaintiffs' argument is not particularly well developed. Although they argue for "a higher rate" for the Export Buyer's

Credit Program, they propose neither an alternative rate, nor an alternative method to determine one.

Finally, the primary purpose of the AFA statute is not to punish companies, but rather to calculate accurate rates. *De Cecco*, 216 F.3d at 1032; *see also Mueller*, 753 F.3d at 1235 ("[T]he primary objective [is] the calculation of an accurate rate."). So long as the AFA rate serves this objective, it is normally found to be within Commerce's sound judgment. *See, e.g.*, *Changzhou I*, 2018 WL 6271653, at *5.

While Plaintiffs would prefer that Commerce depart from its hierarchy and select a higher rate, it was not unreasonable for Commerce to decline to do so. This is especially true because the situation that resulted in Commerce using AFA was created, not by the failure to cooperate by respondents Kangtai or Heze, but that of the Government of China. This distinction matters—Commerce must balance the policies of accuracy and deterrence, or risk potentially undercutting "the cooperation-promoting goal of the AFA statute." *Changzhou Wujin*, 701 F.3d at 1378; *see also Mueller*, 753 F.3d at 1234 (citation omitted) (noting Commerce must consider, on a case-specific basis, "the applicability of deterrence and similar policies"). In other words, the normal purpose of AFA is to induce the respondents themselves to cooperate. Should the respondents find that there is no benefit to their cooperation, they might well conclude that answering Commerce's questionnaires was not worth their while.

Accordingly, the court sustains Commerce's use of its hierarchy in determining an AFA rate for the Export Buyer's Credit Program.


**II.     Commerce's Selection of 0.87 Percent as the AFA Rate for the Export Buyer's Credit Program Is Supported by Substantial Evidence**

In the Final Results, Commerce selected an AFA rate for the Export Buyer's Credit

Program using its four-step hierarchy. Under step two of the hierarchy, Commerce determined that

the Export Buyer's Credit Program and the Export Seller's Credit Program were similar because

both conferred a similar benefit—access to government-subsidized loans. Final IDM at 12-13

("[U]pon examination of the available above *de minimis* programs from the current review and the

underlying investigation, Commerce selected the Export Seller's Credit Program because it

confers the same type of benefit as the Export Buyer's Credit Program, as both programs are

subsidized loans from the China [Export Import] Bank."). Thus, Commerce used the 0.87 percent

*ad valorem* countervailable subsidy rate, which had previously been determined for the Export

Seller's Credit Program in a prior segment of the proceeding, as the AFA rate for the Export

Buyer's Credit Program. *See* Final IDM at 13.

Plaintiffs maintain that the 0.87 percent rate is not supported by substantial evidence

because the record does not support Commerce's finding that the Export Buyer's Credit Program

and the Export Seller's Credit Program are "similar":

> Commerce did not explain its decision that the Export Buyer's Credit was "similar"
> to China's Export Seller's Credit and cited no record evidence to support that
> decision. Fundamentally, a subsidy paid to buyers, unlike a subsidy to sellers,
> directly reduces the cost to the buyer. The terms of the Buyer's Credits limited the
> loans to foreign importers and other foreign entities, and permit payment in U.S.
> dollars. These terms contrast with the terms of the Seller's Credits. Otherwise,
> because the Government of China failed to provide information requested by
> Commerce, there was no evidence with which to determine whether Export Buyer's
> and Export Seller's Credits were similar in terms and conditions, amount of the
> credits, interest rates, duration, or any other measurable criteria. As such, the
> determination that these credits were similar was not based on substantial evidence.

Pls.' Br. 3. Put another way, for Plaintiffs, "similarity" requires more than a finding that the two

programs are government-subsidized loan programs. They contend that because the terms and

conditions of each program are different Commerce has not demonstrated that the programs are similar. Pl.'s Br. 4.

Based on the record, the court finds that Commerce has supported with substantial evidence, and adequately explained, its similarity finding. Here, Commerce found, using information provided by the Government of China, that the Export Seller's Credit Program "confers the same type of benefit as the Export Buyer's Credit Program, as both programs are subsidized loans from the China [Export Import] Bank." Final IDM at 12-13. There is no dispute that the record shows that both programs provide loans at preferential rates from the Government of China through the China Export Import Bank to support Chinese exports.

This Court has upheld Commerce's finding that the Export Buyer's Credit Program is "similar" to other programs that confer subsidized loans. In *Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, __, 352 F. Supp. 3d 1316, 1328 (2018) ("*Changzhou II*"), the Court reviewed Commerce's finding that the Export Buyer's Credit Program and a preferential lending program aimed at the renewable energy industry (the "Lending Program") were similar because both provided access to loans at preferential rates. *Changzhou II*, 42 CIT at __, 352 F. Supp. 3d at 1328 (noting that "Commerce predicated [its] finding of similarity on both the [Export Buyer's Credit Program's] and the [Lending] Program's distribution of loans."). The Court reached its decision even though the plaintiffs argued that the program at issue here, the Export Seller's Credit Program, was more similar to the Export Buyer's Credit Program than the Lending Program. In other words, the plaintiffs in *Changzhou II* argued that Commerce erred by failing to examine whether the Export Seller's Credit Program or the Lending Program was "more similar" to the Export Buyer's Credit Program. Relying on the plain language of the statute, the Court rejected this argument: "Under Commerce's established [hierarchy] methodology and consistent with the

plain text of the statute, Commerce selects a *similar* program, not necessarily the *most similar* program." *Changzhou II*, 42 CIT at __, 352 F. Supp. 3d at 1328 (citing 19 U.S.C. § 1677e(d)(1)(A)(i)).

The *Changzhou II* holding applies equally here. To apply step two of its hierarchy, Commerce must select a program that is similar to the one with respect to which information is missing from the record. To make this selection, Commerce is not required to compare multiple programs to determine which is the "most similar" to the program. *Id.*, 42 CIT at __, 352 F. Supp. 3d at 1328-29. Selecting a program that is similar is enough to satisfy the statute.

The plaintiffs in *Changzhou II* also argued, as Plaintiffs do here, that Commerce had failed to explain adequately its rationale underlying its similarity finding. As summarized by the Court, Commerce stated how it arrived at its similarity finding:

> After finding no program identical to the [Export Buyer's Credit Program] in the same administrative review, Commerce identified a similar program in the same proceeding to use as a basis for calculating the rate for the [Export Buyer's Credit Program]. . . . . Commerce calculated a rate of 5.46 percent *ad valorem*, for the [program] by utilizing the rate "calculated for company respondent Lightway Green New Energy Co., Ltd.'s usage of the [Lending Program] in the 2012 administrative review of this proceeding." . . . . Commerce explained that the [Lending Program] . . . was similar because both it and the Export Buyer's Credit Program provided access to loans.

*Changzhou II*, 42 CIT at __, 352 F. Supp. 3d at 1327 (record citations omitted). The Court found that Commerce was not required to provide a more detailed explanation of its similarity finding, and that substantial evidence supported its decision: "Although a more detailed description [of why the Export Buyer's Credit Program and the Lending Program were "similar"] might be helpful, it is not required." *Id.*, 42 CIT at __, 352 F. Supp. 3d at 1329.

This Court also found adequate Commerce's explanation of its similarity finding in *Solarworld Americas, Inc. v. United States*, 40 CIT __, __, 182 F. Supp. 3d 1372, 1377-78 (2016),

which again involved the Export Buyer's Credit Program and the Lending Program. There, the

parties disagreed as to whether Commerce had adequately explained its similarity finding. As

summarized by the Court, Commerce stated the basis for its finding:

> [N]oting that it lacked a calculated rate for the Export Buyer's Credit Program from
> another responding company, Commerce applied the second level of its AFA rate
> selection hierarchy for administrative reviews. . . . Thus, it selected the rate
> calculated for the [Lending Program] in this same administrative review to the
> Export Buyer's Credit Program after determining that the two programs were
> similar. . . . Commerce supported its determination that the programs were similar,
> noting that both programs call for financial institutions to provide *loans at
> preferential rates*.

*Solarworld Americas, Inc. v. United States*, 40 CIT __, __, 182 F. Supp. 3d 1372, 1377-78 (2016)

(emphasis added) (record citations omitted). The Court found that "Commerce's logic in

considering the programs similar [was] reasonably discernible because both loan programs

perform similar functions in support of Chinese industry by offering lower interest rates on loans

than would otherwise be available to these companies." *Id.*, 40 CIT at __, 182 F. Supp. 3d at 1377

n.8. Considering the similar purposes of the programs it is fair to presume that the subsidy provided

would be about the same and that the benefit conferred by each program would be about the same.

    As in *Changzhou II* and *SolarWorld*, Commerce's rationale for finding that the Export

Buyer's Credit Program and the Export Seller's Credit Program were similar is reasonably

discernible. Plaintiffs point to the dearth of information on the record regarding the specific terms

and conditions of the two programs, insisting that Commerce could not reasonably have compared

them. While programmatic details might be useful, in this case what is needed is a way to find the

size of the benefit that the respondents could reasonably be said to have received, so that a

percentage can be added to the amount of the countervailing duty. Thus, the details of the program

are less important than the benefit conferred. *See* Final IDM at 12-13 ("Commerce selected the

Export Seller's Credit Program because it confers the same type of benefit as the Export Buyer's

Credit Program, as both programs are subsidized loans from the China [Export Import] Bank.");

*see also Clearon*, 43 CIT at __, 359 F. Supp. 3d at 1347 (discussing both programs).

   As their names indicate, each program's purpose is to support Chinese industry by promoting exports. *See* Heze's Sec. III Quest. Resp., Ex. 10 at Art. 2 (Rules Governing Export Buyers' Credit, dated Nov. 20, 2000) (English trans.) ("The Export Buyer's Credit refers to the medium and long-term credit offered by the [China Export Import] Bank to creditworthy foreign borrowers to support the export of Chinese capital goods, services."); *Chlorinated Isocyanurates From the People's Rep. of China*, 79 Fed. Reg. 10,097 (Dep't Commerce Feb. 24, 2014), and accompanying Preliminary Decision Mem. (Feb. 11, 2014), subsec. XII.A.3 ("The purpose of [the Export Seller's Credit Program] provided by [the China Export Import Bank] is to support the export of [Chinese] products and improve their competitiveness in the international market. The export seller's credit [i]s a loan with a large amount, long maturity, and preferential interest rate."). Given their common purpose, it is not unreasonable to conclude that the interest rate charged for the loans would be about the same. That is, each is a program initiated by the Government of China to provide below-market-rate loans to benefit Chinese producers. While additional information, had it been provided by the Government of China, may have allowed Commerce to make a more detailed comparison of the two programs, Commerce's conclusions regarding the rate of subsidization (and hence the benefit conferred) are adequately supported by the record. *See Clearon*, 43 CIT at __, 359 F. Supp. 3d at 1360-61 (upholding the 0.87 percent rate as supported by substantial evidence).

   Accordingly, Commerce's selection of 0.87 percent as the AFA rate for the Export Buyer's Credit Program is sustained.

## CONCLUSION

Based on the foregoing, Commerce's use of its hierarchy and the resulting 0.87 percent rate for the Export Buyer's Credit Program are supported by substantial evidence and otherwise in accordance with law. Judgment shall be entered accordingly.

                                                            /s/ Richard K. Eaton
                                                      Richard K. Eaton, Judge

Dated:
            April 7, 2020
            New York, New York